Tom J. Ferber
James A. Janowitz
Benjamin S. Akley
PRYOR CASHMAN LLP
Attorneys for Defendants
7 Times Square
New York, New York  10036-6569
(212)421-4100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x,
MARCUS WEBB,                                               11 CIV 7517 (JSR)
                              Plaintiff,

        - against -


SYLVESTER STALLONE, ET AL,

                              Defendants.
-------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

UNCONTROVERTED FACTS ................................................................................................. 3

ARGUMENT ............................................................................................................................. 6

I.  PLAINTIFF CANNOT DEMONSTRATE COPYING .................................................. 6

    A.  The Uncontroverted Evidence Demonstrates
    That The Film Was Independently Created ......................................................... 6

    B.  Plaintiff Cannot Demonstrate Access ................................................................. 8

        1.  Plaintiff Cannot Demonstrate A "Link" ..................................................... 8

        2.  Plaintiff Cannot Demonstrate "Wide Dissemination" of *Cordoba* ............... 9

    C.  There Are No Similarities Between *Cordoba*
    and The Film That Are Probative of Copying ................................................... 10

III.  THERE IS NO ACTIONABLE SIMILARITY
    BETWEEN *CORDOBA* AND THE FILM ................................................................ 12

    A.  Basic Story Ideas, *Scenes A Faire*, and Ordinary Terms Are Not Protectable .......... 13

    B.  The Works Are Dissimilar in Plot, Theme and "Overall Concept and Feel" .......... 16

    C.  There is No Actionable Similarity Between The Characters ............................... 19

    D.  Additional, Abstract Comparisons Drawn By
    Plaintiff Reveal The Meritless Nature of His Claim ......................................... 23

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE(s)**

Arden v. Columbia Pictures Industries,
    908 F. Supp. 1248 (S.D.N.Y. 1995) .................................................................................... *passim*

Arica Institute, Inc. v. Palmer,
    970 F.2d 1067 (2d Cir. 1992) ............................................................................................ 15

Berkic v. Crichton,
    761 F.2d 1289 (9th Cir. 1985) ...................................................................................... 14, 15

Brown v. Perdue,
    No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995
    (S.D.N.Y. Aug. 4, 2005), aff'd, 177 Fed. Appx. 121 (2d Cir. 2006) ....................... 12, 13, 18, 19

Bunick v. UPN,
    06 Civ. 2833 (RMB)(HBP), 2008 U.S. Dist. LEXIS 35536
    (S.D.N.Y. Apr. 30, 2008) ................................................................................................ 9

Burroughs v. Metropolitan-Goldwyn-Mayer, Inc.,
    683 F.2d 610 (2d Cir. 1982) ............................................................................................ 24

CBS Broad., Inc. v. ABC,
    02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258
    (S.D.N.Y. Jan. 13, 2003) ................................................................................................ 15

Chivalry Film Prods. v. NBC Universal, Inc.,
    05-cv-5627 (GEL), 2006 U.S. Dist. LEXIS 92956 (S.D.N.Y. Dec. 22, 2006),
    aff'd, 249 Fed. Appx. 856 (2d Cir. 2007) ........................................................................ 7

Chivalry Film Prods. v. NBC Universal, Inc.,
    05-cv-5627 (GEL), 2007 U.S. Dist. LEXIS 86889 (S.D.N.Y. Nov. 27, 2007) ..................... 7, 8

Conan Properties, Inc. v. Mattel, Inc.,
    712 F. Supp. 353 (S.D.N.Y. 1989) .................................................................................. 6

Dellar v. Samuel Goldwyn, Inc.,
    150 F.2d 612 (2d Cir. 1945) ............................................................................................ 2

Denker v. Uhry,
    820 F. Supp. 722 (S.D.N.Y. 1992), aff'd, 996 F.2d 301 (2d Cir. 1993) ....................... 12

Dimmie v. Carey,
    88 F. Supp. 2d 142 (S.D.N.Y. 2000) .............................................................................. 7, 9

**CASES**                                                                 **PAGE(s)**

Ellis v. Diffie,
    177 F.3d 503 (6th Cir. 1999)....................................................................... 9

Gal v. Viacom International, Inc.,
    518 F. Supp. 2d 526 (S.D.N.Y. 2007)...................................................... 8, 9

Green v. Lindsey,
    885 F. Supp. 469 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993) ................... 15, 19

Hogan v. DC Comics,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999)....................................................... passim

Johnson v. Gordon,
    409 F.3d 12 (1st Cir. 2005) ...................................................................... 11

Jorgensen v. Epic/Sony Records,
    351 F.3d 46 (2d Cir. 2003) ....................................................................... 9

Lewinson v. Henry Holt & Co.,
    659 F. Supp. 2d 547 (S.D.N.Y. 2009)............................................... 13, 15, 24

Mowry v. Viacom Int'l Inc.,
    No. 03 Civ. 3090 (AJP), 2005 U.S. Dist. LEXIS 15189
    (S.D.N.Y. July 29, 2005)...................................................................... 8, 9

Muller v. Twentieth Century Fox Film Corp.,
    794 F. Supp. 2d 429 (S.D.N.Y. 2011)...................................................... passim

Murray Hill Publ'g v. Twentieth Century Fox Film Corp.,
    361 F.3d 312 (6th Cir. 2004)................................................................... 10

Nicholls v. Tufenkian Import/Export Ventures, Inc.,
    367 F. Supp. 2d 514 (S.D.N.Y. 2005)...................................................... 10

Nichols v. Universal Pictures Corp.,
    45 F.2d 119 (2d Cir. 1930) ..................................................................... 13

Novak v. National Broadcast Co.,
    752 F. Supp. 164 (S.D.N.Y. 1990) ............................................................ 9

Novak v. National Broadcast Co.,
    760 F. Supp. 47 (S.D.N.Y. 1991) ............................................................. 7

O'Keefe v. Ogilvy & Mather Worldwide, Inc.,
    590 F. Supp. 2d 500 (S.D.N.Y. 2008).................................................... 10

**CASES**                                                                              **PAGE(s)**

Peter F. Gaito Architecture v. Simone Development Corp.,
    602 F.3d 57 (2d Cir. 2010) ........................................................................ 12

Polsby v. St. Martin's Press,
    No. 97 Civ. 690(MBM), 2000 U.S. Dist. LEXIS 596 (S.D.N.Y. Jan. 18, 2000) ......................... 7

Sheldon Abend Revocable Trust v. Spielberg,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010) ........................................................... 19

Silberstein v. Fox Entertainment Group, Inc.,
    424 F. Supp. 2d 616 (S.D.N.Y. July 19, 2004), aff'd,
    242 Fed. Appx. 720 (2d Cir. 2007) ...................................................... 7, 9, 10

Smith v. Weinstein,
    578 F. Supp. 1297 (S.D.N.Y.), aff'd w/o op., 738 F.2d 419 (2d Cir. 1984) ................. 20, 24

Tisi v. Patrick,
    97 F. Supp. 2d 539 (S.D.N.Y. 2000) ............................................................. 7, 8

Warner Brothers, Inc. v. American Broadcast Cos.,
    720 F.2d 231 (2d Cir. 1983) ................................................................. 12, 19

Williams v. Crichton,
    860 F. Supp. 158 (S.D.N.Y. 1994), aff'd, 84 F.3d 581 (2d Cir. 1996) ................. 14, 15, 19

Zambito v. Paramount Pictures Corp.,
    613 F. Supp. 1107 (E.D.N.Y.), aff'd w/o op., 788 F.2d 2 (2d Cir. 1985) ................. 12, 24

iv

Marcus Webb ("Webb" or "Plaintiff"), the author of a screenplay and short story entitled *The Cordoba Caper* ("*Cordoba*"), which present the story of "a team of elite, highly-trained mercenaries" who undertake a mission to topple the dictator of a small Latin American country, claims that defendants David Callaham ("Callaham") and Sylvester Stallone ("Stallone"), who "are credited with co-authoring the screenplay for the motion picture *The Expendables*" (the "Film"), and/or Alta Vista Productions, Inc., which is credited with authorship of the Film in Copyright Office filings, must have copied *Cordoba* because of alleged similarities between his work and the Film. (Second Amended Complaint, "Complt.," at ¶¶2, 21-24.)

It is incontrovertible, however, that <u>Webb wrote *Cordoba* after Callaham wrote three drafts of a screenplay which was later revised by Stallone for the Film.</u>  Moreover, Webb admits that he has no information that Callaham, Stallone or any other defendant ever had possession of or even laid eyes on *Cordoba*.  He nonetheless bases his infringement claim on alleged similarities between *Cordoba* and the Film which were in Callaham's pre-*Cordoba* drafts, including, *inter alia*: (a) introducing the team of "mercenaries" in the opening scene with a "hostage rescue"; (b) a "middle-aged" former Special Forces-type veteran as the leader of mercenaries; (c) the leader fights for causes he believes in; (d) the mercenaries are hired to overthrow a general who leads a repressive regime in a small Latin American country; (e) a second tyrannical figure at the dictator's side; (f) a female character who is sympathetic to the mercenaries' mission and serves as their guide to her country; (g) numerous fight scenes, featuring massive shootouts and explosives, with a helicopter being blown up; and (h) a conclusion in which the mercenary leader leaves the money he was paid for the mission in the hands of the sympathetic female character.

Plaintiff's copyright claim based on these and other alleged similarities should be rejected, however, because: (i) <u>the elements which form the overall structure and plotline of the Film – including all of those listed above – were in the draft screenplays written by Callaham *before* Plaintiff</u>

wrote *Cordoba*; (ii) these and other alleged similarities concern unprotectable *ideas* which are given dissimilar *expression* in the parties' respective works; and (iii) other elements relied upon by Plaintiff concern unprotectable stock elements and *scenes a faire*. Beyond their basic story lines, the works differ fundamentally in their "overall concept and feel": Webb's script, as its title indicates, concerns a complex "caper"; the Film is a classic action piece.

This palpably meritless case is the product of two things: (i) a fundamental misapprehension of the scope of copyright protection – including, in particular, the critical distinction between unprotectable plot concepts or ideas and the detailed, copyrightable expression of such ideas; and (ii) "that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." Dellar v. Samuel Goldwyn, Inc., 150 F.2d 612, 613 (2d Cir. 1945)(per curiam). That "obsessive conviction" has motivated Plaintiff – who has admitted that his work was never published or widely disseminated and that he has no information that any of the Defendants ever saw or even heard of *Cordoba* – to pursue a wholly unsupported and speculative conspiracy theory. Indeed, once Plaintiff was provided with Callaham's pre-*Cordoba* drafts early on in the proceedings, the pursuit of this case, which was always without merit as a matter of both law and fact, became not just objectively unreasonable, but frivolous.

Defendants Callaham, Stallone, Millennium Films, Inc., Nu Image, Inc., Lions Gate Films, Inc., Lions Gate Entertainment Inc., Alta Vista Productions Inc., Alta Vista Productions, LLC and Double Life Productions, Inc., therefore move for summary judgment.

2

## UNCONTROVERTED FACTS

In late 2002, Callaham entered into an agreement with Warner Bros. ("WB") to write two screenplays: one based on the video game "Doom" and a second to be agreed upon later.[1]   Intrigued by news stories about private mercenaries, Callaham later proposed to write his second screenplay on this subject, and WB agreed.   Between early 2005 and January 2006, Callaham wrote and submitted three drafts of a screenplay tentatively entitled "Barrow," about a team of elite, highly-trained mercenaries who undertake a mission to overthrow the military dictator of a small Latin American island.   (56.1 at ¶2-5.)

Nothing happened with Callaham's screenplay at WB, but in mid-2008 it was submitted to Stallone through his agents at the William Morris Agency.   (56.1 at ¶8.)   Stallone, who had been looking for an action-oriented ensemble project, liked Callaham's script, and over the next few months he had discussions with Nu Image about developing the project and he undertook a number of rewrites.   Stallone wanted to make the Film as action-oriented as possible, so he dropped subplots, characters and scenes from Callaham's draft, which Nu Image acquired from WB. (56.1 at ¶7, 9-13.)   Stallone also adopted character names which he thought would be easier to remember than those used by Callaham.   He changed the name of the mercenaries' leader from "Barrow Miles" to "Barney Ross," which was the adopted moniker of a champion boxer.   He thought the name of Callaham's dictator – "General Miramonte" – was too long, so he turned to the name of another boxer, "Jaime Garza," but changed the first name, which he didn't like for the dictator character, and ultimately referred to his dictator as "General Garza."   For the name of co-star Jason Statham's character, he used the name of an actual mercenary who had gone to Latin America a century ago – "Lee Christmas."   He named one of the antagonists "Paine," because he inflicts pain on others. (56.1 at ¶¶14.)

---

[1] Defendants' Statement Pursuant to Local Rule 56.1 (hereafter "56.1") at ¶1.

The Film, which featured Stallone, Jason Statham, Jet Li, Dolph Lundgren, Bruce Willis and Arnold Schwarzenegger, among others, was released on August 13, 2010. (56.1 at ¶15.)

Webb is an employee of Walker Digital, LLC, where he helps the company's executives craft speeches, writes scripts for promotional videos, and works on marketing materials. He previously worked with a variety of trade magazines. (56.1 at ¶¶16-17.) Webb has never worked in the motion picture or television industries, although he has written a number of screenplays and teleplays, none of which have been produced. (56.1 at ¶18.)

In 2006, Webb came up with an idea for a screenplay which would start with a team of mercenaries rescuing a young woman and then have the mercenaries being hired by a billionaire to stop a genocide. It would ultimately be called "The Cordoba Caper." His story would have two villains: a Latin American Fascist dictator and a Marxist minister of state security. They would be named "General Garza" and "Colonel Torres," respectively. (56.1 at ¶¶19-22.) Webb would use a plot structure from some of his favorite films – the "triple-cross plot," examples of which were in "The Sting," "Where Eagles Dove" and other films in which the plots feature multi-layered scams where the heroes assume false personas. (56.1 at ¶23.) Webb would also have what he called "two main thrusts against [his] fictional military regime." One would be an ideological power struggle between his Fascist general and Marxist minister of security based on the historic "Night of the Long Knives," in which Hitler had his "security chief," Ernst Rohm, killed because of such a power struggle and ideological conflict. Webb's second idea was to have "an underground resistance movement" to assist the mercenaries. The leader of that rebel movement would be a woman with whom the hero fell in love, and the "twist" would be that this female character would have a "secret identity" and she would be the "champion for the victims of the genocide…even though she was engaged in some violence." (56.1 at ¶¶24-26.) As part of his "triple cross," Webb would have his

4

hero, "Anselm St. John," enter the dictator's country pretending to be a CIA agent, who, in turn, pretends to be an oil executive, although the audience would know he is not. (56.1 at ¶27.)

Webb made a number of notes outlining ideas for his screenplay through March and April of 2006.  He then wrote both a screenplay, which included "classic movie elements," and a short story version of *Cordoba*, registering them with the U.S. Copyright Office on June 8 and 9, 2006. (56.1 at ¶28.)

Webb never submitted the short story to anyone. (56.1 at ¶31.)  Similarly, he never submitted the screenplay to any film studio, production entity or any film or television producer. (56.1 at ¶¶32.)  Webb claims to have submitted his screenplay to eight screenplay competitions, but he has no knowledge of his script being sent by anyone involved with those competitions to anyone outside them. (56.1 at ¶¶33-36, 38.)

Webb first heard about the Film in late 2009 or early 2010, when the press about Stallone appearing in a film about mercenaries in a South American country piqued his interest, because he thought it sounded like his screenplay. (56.1 at ¶41.) Webb saw the Film the day it opened – August 13, 2010. (56.1 at ¶42.)  He commenced this action on October 24, 2011.  Neither Callaham nor Stallone had ever heard of *Cordoba* before this case. (56.1 at ¶43.)

Webb has no information that either Callaham or Stallone ever had a copy of *Cordob*a in their possession. (56.1 at ¶42.)  Explaining his assertion that "access is inferred," Webb conjectured "that Mr. Stallone or someone who works with him or has friendly business relations with him or hopes to have friendly business relations with him or knows someone who falls into all of those categories *may* have somehow gotten their hands on a copy" of his work and passed it on. (56.1 at ¶¶47-48.) With regard to his "inference" of access, Webb admits that "there is no inferential finger pointing at any specific [defendant]." (56.1 at ¶49.)  Webb knows of no direct evidence that Stallone or any other defendants ever saw *Cordoba*. (56.1 at ¶50.)  Webb describes both *Cordoba* and the Film as

telling the story of a team of elite, highly-trained mercenaries who undertake a mission to overthrow the dictator of a small Latin American country.  He acknowledges that Callaham's pre-existing work also tells such a story. (56.1 at ¶¶51-52; Complt. at ¶¶21-22.)

## ARGUMENT

"The Second Circuit has emphasized that summary judgment is meant to clear the air before trial and thereby enable a district judge to see whether any fire of substance lies beneath the parties' smoke." Conan Props., Inc. v. Mattel, Inc., 712 F. Supp. 353, 356 (S.D.N.Y. 1989).  This case is all "smoke."  To prove copyright infringement a plaintiff must demonstrate all of the following:  (i) access by the defendant to the plaintiff's work, which can be demonstrated either through a direct "link" or through evidence of "widespread dissemination"; (ii) similarities between the works that are probative of copying as opposed to independent creation (i.e., "probative similarity"); and (iii) substantial similarity of protectable  elements.[2] See, e.g., Hogan v. DC Comics, 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999).  The uncontroverted evidence demonstrates that the Film was independently created.  There was neither a "link" between Cordoba and Defendants nor was Cordoba "widely disseminated."  There is no similarity between the works that would be probative of copying even without considering the prior creation of the Callaham drafts, but when they are considered, the case law indicates that no inference of copying can be drawn.  Finally, there is no actionable similarity between Cordoba and the Film as a matter of law.

## I.    PLAINTIFF CANNOT DEMONSTRATE COPYING

### A.    The Uncontroverted Evidence Demonstrates That The Film Was Independently Created

It is beyond dispute that Callaham's screenplays preceded Cordoba, and it is incontrovertible that Stallone revised Callaham's drafts for the Film.  Independent creation is established where, as

---

[2] A copyright plaintiff must also prove a valid copyright registration, but that is conceded for the purposes of this motion.

here, there is evidence of the evolution of a defendant's work separate and apart from Plaintiff's work. Dimmie v. Carey, 88 F. Supp. 2d 142, 150-51 (S.D.N.Y. 2000)(summary judgment granted); see also Tisi v. Patrick, 97 F. Supp. 2d 539, 549 (S.D.N.Y. 2000)(summary judgment granted); Silberstein v. Fox Entm't Group, Inc., 424 F. Supp. 2d 616, 628 (S.D.N.Y. July 19, 2004), aff'd, 242 Fed. Appx. 720 (2d Cir. 2007) (summary judgment granted).  And where, as here, independent creation is proven, summary judgment should be granted.  See Chivalry Film Prods. v. NBC Universal, Inc., 05-cv-5627 (GEL), 2006 U.S. Dist. LEXIS 92956, at *8-9 (S.D.N.Y. Dec. 22, 2006), aff'd, 249 Fed. Appx. 856 (2d Cir. 2007) (summary judgment appropriate where plaintiff fails to offer evidence sufficient to raise factual question about defendant's proof of independent creation), citing Novak v. National Broad. Co., 760 F. Supp. 47, 48 (S.D.N.Y. 1991).[3]

    The uncontroverted evidence shows that Callaham wrote his draft screenplays well before Webb wrote *Cordoba*, that Stallone did rewrites of Callaham's drafts, and that neither they nor any other Defendant ever heard of or read *Cordoba*.  The Film was a product of independent creation, and Webb's speculation does not constitute evidence with which to dispute the point.  Summary judgment should be granted on this basis alone because, as was noted by the court in Muller v. Twentieth Century Fox Film Corp., 794 F. Supp. 2d 429, 443 (S.D.N.Y. 2011), "[i]n contrast to

_____

[3] In Chivalry, the evidence of independent creation (a film of the same title as defendants' work that pre-dated plaintiff's work and upon which defendants indisputably relied when creating their own film) and the differences between plaintiff's work and defendants' work resulted in the court's awarding the defendants their attorneys' fees, finding that "[t]he complete lack of any reasonable basis for plaintiff's copyright claim thus establishes that his claim was frivolous and objectively unreasonable, and an award of fees and costs is appropriate here."  Chivalry Film Prods. v. NBC Universal, Inc., 05-cv-5627 (GEL), 2007 U.S. Dist. LEXIS 86889, at *7-8 (S.D.N.Y. Nov. 27, 2007) (citing Polsby v. St. Martin's Press, No. 97 Civ. 690(MBM), 2000 U.S. Dist. LEXIS 596, at *3 (S.D.N.Y. Jan. 18, 2000)).

[Plaintiff's] virtually non-existent evidence of copying, defendants submitted indisputable evidence of their independent creation of the Film."[4]

**B.      Plaintiff Cannot Demonstrate Access**

Given that the evidence of independent creation is uncontroverted, it is no surprise that Webb offers only conjecture regarding possible theories of access to his work.  In order to make the requisite showing of access, however, Webb would have to offer evidence of either (i) "a particular chain of events" or a "link" from his work to the creators of the Film, or (ii) that *Cordoba* was "widely disseminated." Gal v. Viacom Int'l, Inc., 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007); see also Mowry v. Viacom Int'l Inc., No. 03 Civ. 3090 (AJP), 2005 U.S. Dist. LEXIS 15189, at *12-13 (S.D.N.Y. July 29, 2005).  Moreover, Plaintiff must make this showing with "significant, affirmative and probative" evidence, not mere "speculation or conjecture." Muller, 794 F. Supp. 2d at 439; Tisi, 97 F. Supp. 2d at 547.  No such evidence exists in this case.

**1.      Plaintiff Cannot Demonstrate A "Link"**

There is no evidence of a "link" through which Callaham, Stallone or any other Defendant supposedly had access to *Cordoba*.   Indeed, Webb admitted that he "inferred" access thinking "that Mr. Stallone or someone who works with him or has friendly business relations with him or hopes to have friendly business relations with him or knows someone who falls into all of those categories ***may*** have somehow gotten their hands on a copy" of his work and passed it on.  He further admitted that "there is no inferential finger pointing at any specific [defendant]" – i.e., he has no idea, let alone evidence, as to which defendant supposedly had access.  Webb knows of no direct evidence that any Defendant ever saw *Cordoba*. (56.1 at ¶¶48-50.)  Thus, Webb offers no evidence of either "a particular chain of events" or a "link" from his work to the creators of the Film.  See Muller, 794 F.

---

[4] The court in Muller noted that "at best [Plaintiff] alleges only 'bare corporate receipt' of the Screenplay…," which it rejected. Id. at 442-43.  In the present case, Webb does not even offer evidence to support a "bare corporate receipt" theory.

Supp. 2d at 442-44 (rejecting plaintiff's theories of access which were "based on speculation and conjecture rather than concrete evidence" where plaintiff admitted that he had no information that defendant ever received his screenplay and where defendant testified that he had neither read nor heard of plaintiff's screenplay prior to the lawsuit; summary judgment granted); see also Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003); Bunick v. UPN, 06 Civ. 2833 (RMB)(HBP), 2008 U.S. Dist. LEXIS 35536, at *9-10 (S.D.N.Y. Apr. 30, 2008); Ellis v. Diffie, 177 F.3d 503, 506-07 (6th Cir. 1999); Novak v. National Broad. Co., 752 F. Supp. 164, 168 (S.D.N.Y. 1990); Tisi, 97 F. Supp. 2d at 547-48; Dimmie, 88 F. Supp. 2d at 146-47; Silberstein, 424 F. Supp. 2d at 627.

## 2.   **Plaintiff Cannot Demonstrate "Wide Dissemination" of *Cordoba***

Nor can Webb offer the alternative – evidence that *Cordoba* was "widely disseminated." "Where a work is unpublished...it is considered not to have been widely disseminated." Gal, 518 F. Supp. 2d at 538 (citing Mowry, 2005 U.S. Dist. LEXIS 15189, at *14)(emphasis supplied); see also Silberstein, 424 F. Supp. 2d at 627 ("[t]his court has consistently recognized widespread dissemination giving rise to an inference of access exclusively in cases where the allegedly infringed work has had considerable commercial success or is readily available on the market")(emphasis supplied).  Webb's work was never published or produced.  It had no "commercial success," let alone "*considerable* commercial success," and it was never "readily available on the market," since it never reached the market.

Webb attempts an end run around the "widespread dissemination" requirement by creating his own would-be substitute, alleging that *Cordoba* was "widely *available* for viewing and consideration" by reason of the screenplay contests in which he entered it.  (Complt. at ¶20.)  His allegation of "widespread availability" is at odds with the record[5] and in no way satisfies this

---

[5] Webb admitted that he has no knowledge of his script being sent by anyone involved with the competitions to anyone outside them. (56.1 at ¶¶33-34.)  Indeed, there is no evidence that his

requirement, since participation in a few screenplay competitions – none of which Webb won[6] – does not constitute "widespread dissemination," i.e., "considerable commercial success" or being "readily available on the market." Silberstein, 424 F. Supp. 2d at 627.

Accordingly, there is no evidence of either a direct "link" or of "wide dissemination" of Cordoba, and thus no evidence of access to it by the creators of the Film.

## C.  There Are No Similarities Between Cordoba and The Film That Are Probative of Copying

Probative similarity requires "similarities between the two works that would not be expected to arise if the works had been independently created." Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F. Supp. 2d 514, 522 (S.D.N.Y. 2005); see also O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 514-515 (S.D.N.Y. 2008); Mowry, 2005 U.S. Dist. LEXIS 15189, at *9.  As the court in Muller, 794 F. Supp. 2d 429, recently noted, where, as here, the defendants' own prior works contain elements which a plaintiff alleges were copied from his subsequently created work, no inference of copying from the plaintiff's work can be drawn.  Id. at 444, citing Murray Hill Publ'g v. Twentieth Century Fox Film Corp., 361 F.3d 312, 316 (6th Cir. 2004) (defendants would have "no reason…to copy wrongfully from another what [they] could legally copy from [themselves]").  Thus, the story of mercenaries hired by a "seemingly rich executive" to topple the dictator of a Latin American nation (Complt. at ¶23(8)), which came from

_____

screenplay was made "available" to anyone outside of them, the only indications being to the contrary. (56.1 at ¶¶35-36, 38-39.)

[6] While the American Zoetrope contest stated that the top 11 screenplays would be sent to participating agencies, Webb's did not place in the top 11. The reader of his script said Webb's "story-then-subplot-then-story again, about a war for oil, … is very irritating." The PAGE contest had a policy of not forwarding scripts to anyone other than contest judges, and Webb has no evidence that this policy was violated with respect to his screenplay. The one judge in the ASA Screenwriting competition to read Cordoba said that its "story [was] not emotionally engaging enough for me to recommend advance."  In the Big Break competition, in which Cordoba was also eliminated in the first round, the reader said "It put me to sleep." (56.1 at ¶¶36-40.)

Callaham's screenplay,[7] provides no basis for an inference of copying.  Nor can such an inference be drawn from any plot elements which the Film took from Callaham's screenplay, including, *inter alia*: opening the story with a hostage rescue; a "middle-aged" leader of the team; fighting for righteous causes; a general who is "an evil military dictator of a small Latin American nation" (Complt at ¶23(2)); a second antagonist at the dictator's side[8]; a female character, who is the daughter of another character, who is sympathetic to the mercenaries and guides and then helps them escape after their initial visit; and a conclusion in which the leader leaves his substantial pay for the mission with the female character.

As is demonstrated above, the uncontroverted evidence is that Callaham's screenplay was the product of *prior* independent creation and that Stallone revised that screenplay for the Film. Moreover, the Film is part of a well-known genre, and it contains no similarity to *Cordoba* probative of copying.  See Johnson v. Gordon, 409 F.3d 12, 22-23 (1st Cir. 2005)(use of elements that are common to genre does not constitute probative similarity); see also Muller, 794 F. Supp. 2d at 443 (granting summary judgment for defendants and rejecting a claim of probative similarity between the two works where "[m]any of the similarities are common or stock themes that appear often in these types of works").

---

[7] Callaham's script and the Film both have mysterious figures ("Mr. Monday" and "Mr. Church") hiring the protagonist *Cordoba* had a Scottish billionaire who made no secret of his identity.  Thus, "Mr. Church" was clearly derived from Callaham's draft, not *Cordoba*.  Similarly, only Callaham's script and the Film take place on an island ("Sandrayo" and "Vilena"); Cordoba takes place on the mainland, as indicated by the references to the Andes.

[8] Again, "Monroe," who is ex-CIA, and his sidekick "Paine" in the Film are derived from Callaham's "Murali" and "Ballcap."  (56.1 at ¶13(d).)  Col. Torres in *Cordoba*, to whom Webb tries to draw a strained comparison, is a member of the junta and has nothing to do with the CIA.

## III.   THERE IS NO ACTIONABLE SIMILARITY
## BETWEEN *CORDOBA* AND THE FILM

The Second Circuit has long "recognized that a court may determine non-infringement as a matter of law ..., either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Warner Bros., Inc. v. American Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983)(summary judgment affirmed) (citations omitted); see also Muller, 794 F. Supp. 2d at 441 ("Determining whether there is substantial similarity between a written work and an allegedly infringing motion picture is assessed through a 'detailed viewing or reading of the works themselves,' ... and summary judgment is frequently granted in this context")(internal citation omitted); Hogan, 48 F. Supp. 2d at 309; Arden v. Columbia Pictures Indus., 908 F. Supp. 1248, 1259 (S.D.N.Y. 1995); Denker v. Uhry, 820 F. Supp. 722, 728-29 (S.D.N.Y. 1992), aff'd, 996 F.2d 301 (2d Cir. 1993); Zambito v. Paramount Pictures Corp., 613 F. Supp. 1107, 1110 (E.D.N.Y.), aff'd w/o op., 788 F.2d 2 (2d Cir. 1985).[9]

Courts in this Circuit apply the "discerning ordinary observer test" where, as here, a work contains both protectable and non-protectable elements. Hogan, 48 F. Supp. 2d at 309 (citations omitted). The question is whether an "average lay observer," properly instructed to ignore non-protectable elements, would find that "the protectable  elements, standing alone, are substantially similar" in expression. Id. (citations & quotations omitted); accord Peter F. Gaito Architecture v. Simone Dev. Corp., 602 F.3d 57, 66 (2d Cir. 2010); Brown v. Perdue, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995, at *19-20 (S.D.N.Y. Aug. 4, 2005), aff'd, 177 Fed. Appx. 121 (2d Cir. 2006).  As is discussed below, there is no actionable similarity between *Cordoba* and the Film even before the pre-*Cordoba* Callaham drafts are considered, and when the elements from the Film which

---

[9] Plaintiff's screenplay and short story are Exhibits A and D to the Answer.  The DVD of the Film is Exhibit B to the Answer.

were present in Callaham's draft are also filtered out of the comparison – as logic requires since Callaham could not copy from a work not yet written – the inescapable conclusion is that Plaintiff's claim is frivolous. See, e.g., Muller, 794 F. Supp. 2d at 444.

A.    **Basic Story Ideas, *Scenes A Faire*, and Ordinary Terms Are Not Protectable**

"It is beyond dispute that copyright protection extends only to the expression of ideas, and not to the ideas themselves." Hogan, 48 F. Supp. 2d at 308 (citations omitted). See Muller, 794 F. Supp. 2d at 440-41; Lewinson v. Henry Holt & Co., 659 F. Supp. 2d 547, 565-67 (S.D.N.Y. 2009). Callaham's drafts, *Cordoba* and the Film all feature the basic idea of mercenaries being hired to take on a third world dictator. See id. (citing Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930)). This basic idea is not original or proprietary to Plaintiff and is unprotectable as a matter of law.

*Scenes a faire*, which are incidents, characters or settings that are "standard" in the treatment of a given topic, and "thematic concepts … which necessarily must follow from certain plot situations," are also unprotectable. Hogan, 48 F. Supp. 2d at 309 (citation & quotations omitted); accord Brown, 2005 U.S. Dist. LEXIS 15995, at *29 ("thematic concepts which follow from similar plot situations are not afforded protection under the copyright laws"); Arden, 908 F. Supp. at 1260.

The story idea of mercenaries taking on a third world dictator would be expected to feature many or all of the following elements: (i) someone paying the mercenaries a substantial sum; (ii) hostage rescues; (iii) the dictator being ruthless and violating the rights of (or killing) his people; (iv) a bond of friendship between the mercenaries; (v) mercenaries who care about pursuing just causes; (vi) references to the mercenaries' previous missions; (vii) depictions of torture; (viii) fights; (iv) climactic shootouts; and (x) the use of explosives. All of these are *scenes a faire*. It is small wonder, then, that both *Cordoba* and the Film present these elements, as did Callaham's screenplay before Webb wrote *Cordoba*. Yet Plaintiff improperly bases his copyright infringement claim, in substantial

13

part, on precisely such elements.[10] <u>See</u> <u>Williams v. Crichton</u>, 860 F. Supp. 158, 166 (S.D.N.Y. 1994),

<u>aff'd</u>, 84 F.3d 581 (2d Cir. 1996) ("Themes commonly repeated in a certain genre are not protectable

by copyright") (citations omitted).

     <u>Hogan</u> is particularly instructive on this point.  In <u>Hogan</u> the subject works involved half-

human, half-vampire main characters who sought "to uncover the truth about their origins," and

who were "faced with the choice of pursuing good or evil."  48 F. Supp. 2d at 310.  Both characters

had a "sinister genealogy" and were "indoctrinated into the forces of evil by killing," and both

developed romantic interests.  <u>Id</u>.  In addition, "both works use[d] similar imagery, such as religious

symbolism, biblical allusions and the use of doors to see into the past," and both works had "a

'macabre' feel, including scary characters and dark, haunted scenes."  <u>Id</u>.  The court found that most

of the alleged similarities were "unprotectable  ideas and themes" that were "not uncommon to

horror or science fiction literature."  <u>Id</u>. at 310-11; <u>see also</u> <u>Arden</u>, 908 F. Supp. at 1260 (S.D.N.Y.

1995) (similarities in structure stemming from idea of repeating day are unprotectable).

     Equally instructive is <u>Berkic v. Crichton</u>, 761 F.2d 1289, 1293-94 (9th Cir. 1985), where the

court affirmed summary judgment for the defendants regarding their book and film, *Coma*, and

explained:

> At a very high level of generality, the works do show a certain gruesome similarity.
> Both deal with criminal organizations that murder healthy young people, then
> remove and sell their vital organs to wealthy people in need of organ transplants.  To
> some extent, both works take their general story from the adventures of a young
> professional who courageously investigates, and finally exposes, the criminal
> organization.  But this degree of similarity between the basic plots of two works
> cannot sustain a plaintiff's claim that the works are "substantially similar."  No one
> can own the basic idea for a story.  General plot ideas are not protected by copyright
> law; they remain forever the common property of artistic mankind….   [I]n
> Hollywood, as in the life of men generally, there is only rarely anything new under
> the sun.

---

[10] <u>See</u> Complaint and Answer, both at ¶ 23(1), (2), (5); (9); (10); (16)-(18), and (20).

As in <u>Hogan</u>, <u>Arden</u> and <u>Berkic</u>, the basic idea of mercenaries taking on a dictator is not protectable. <u>See</u> <u>CBS Broad., Inc. v. ABC</u>, 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258, at *7, 19 (S.D.N.Y. Jan. 13, 2003) ("both shows combine well-known and frequently used generic elements of earlier works"; "the Second Circuit has held that copyright does not protect facts, generalized themes and ideas, subthemes, stock themes, general imagery, literary formulas … episode or scenes a faire ….") (citations omitted); <u>Green v. Lindsey</u>, 885 F. Supp. 469, 482-83 (S.D.N.Y. 1992), <u>aff'd</u>, 9 F.3d 1537 (2d Cir. 1993) (summary judgment granted; broad themes of "warrior woman" are not copyrightable and "an inspection of the[] alleged similarities reveals that defendant's expression of these stock elements differs markedly from plaintiff's and, to the extent that similarities do exist, they are stock science-fiction elements ….") (citations omitted).

Plaintiff bases his claim not only on the alleged similarity of unprotectable basic story ideas and *scenes a faire*, but he also tries to pad his allegations of similarity with a list which includes random elements (which are given dissimilar expression) and common, unprotectable phrases.[11]  Such lists are expressly disfavored as being "inherently subjective and unreliable."  <u>See</u> <u>Williams</u>, 84 F.3d at 590; <u>Hogan</u>, 48 F. Supp. 2d at 313.  Among other things, Plaintiff's list refers to numerous common terms and phrases – "to Hell and back," "Zorro," "invade," and having "guts"[12] – which are wholly unprotectable and are hardly original to Webb.[13]  <u>See</u> <u>Lewinson</u>, 659 F. Supp. 2d at 568 ("the Second Circuit has held that 'the 'ordinary' phrase may be quoted without fear of infringement'"), <u>quoting</u> <u>Arica Inst., Inc. v. Palmer</u>, 970 F.2d 1067, 1072-73 (2d Cir. 1992).  Webb's list also includes

---

[11] <u>See, e.g.</u>, the list at ¶23 of the Complaint, at points 1, 6, 7, 9, 13-15, 22.  The Court is respectfully referred to Defendant' point-by-point response to Plaintiff's list (Answer at ¶23.)

[12] Complt. at ¶23, points 7, 13-15.

[13] Webb's research included references to Audie Murphy, the most decorated U.S. veteran of World War II, and Webb noted that "To Hell and Back" is the title of both a book and film about Murphy. (Webb Tr. (Ex. "C" to Ferber Dec.) at 121-123.)

numerous trivial points. See Muller, 794 F. Supp. 2d at 440 ("Critical to the issue of improper appropriation is that the copied elements of the work are original and non-trivial")(citation omitted; emphasis supplied).[14]  Plaintiff even claims a "substantial similarity" in a "protectable aspect" by comparing the names of his female helicopter pilot – "20-something" Terri O'Toole, – to "Tool" in the Film - the tattoo artist played by Mickey Rourke.  (Complt. at ¶23 and 23(5).)  Plaintiff manifestly misapprehends the meanings of both "protectable aspects" and "substantial similarity."

**B.**    **The Works Are Dissimilar in Plot, Theme and "Overall Concept and Feel"**

There is no actionable similarity between the plots, themes and "overall concept and feel' of the parties' respective works.

*Cordoba* opens with Anselm St. John and his team of mercenaries rescuing a Saudi princess from a Korean kidnapper during a speedboat chase.  Later, 96-year-old Scottish billionaire Sir Reginald Wilson-Thomas hires St. John to stop the genocide of Andean natives by the junta which rules the South American nation of Cordoba, and to save the Andean woman with whom he'd fathered two children decades earlier.  Sir Reginald threatens to harm St. John's college-age daughter if he refuses.  The junta is led by Gen. Enrique Garza and Col. Ramon Torres.  St. John heads to Cordoba with his team, which includes a female helicopter pilot, a Germanic "in-house scientist" known as "The Prof," a former Mossad agent, a former U.S. Special Forces member and a Black explosives expert.  St. John enacts one ruse on top of another, first infiltrating the junta's inner circle by pretending to be "Roger Thornhill," an oil security expert, then claiming to be a U.S. intelligence agent, and later using a series of deceptions –  including fake assassination plots, fake tortures and having "The Prof" absurdly masquerade as Henry Kissinger – to turn Garza and Torres against each

---

[14] One example of a trivial, random reference is Webb's assertion that both *Cordoba* and the Film make references to the hero's previous missions in Africa. (Complt. at ¶23(9).)  However, these references are made by two *different* characters (Sir Reginald in *Cordoba*, and Tool in the Film) in *dissimilar* contexts.  Moreover, Callaham's preexisting screenplay also made such a reference.  (See Callaham's "3rd Studio Draft," Ex. C to Answer, at 26.)

other. Along the way he meets Renata, the general's niece, who has a secret identity as "Salvadora," the masked leader of the armed rebels who oppose the junta. St. John and Renata have a sexual liaison, and when St. John and his team ultimately win the day, he leaves her as the new president of Cordoba, with the money he was paid by Sir Reginald, who now happily has his former lover and their children with him.

The Film opens with six "Expendables," led by Barney Ross, on a cargo ship, rescuing the crew from Somalian pirates. When trigger-happy Gunnar tries to hang one of the pirates against orders, he is dropped from the group.[15] Later, Barney is offered a job on the island of Vilena by "Mr. Church," who says that his "people" are having trouble with Vilena's leader, Gen. Garza. "Mr. Church" has no humanitarian objective – *e.g.*, stopping a genocide. Barney and team member Lee Christmas make a reconnaissance trip to the island, where they meet Sandra, a local woman who shows them around and tells them that the island was once beautiful, but that Gen. Garza "sold his soul" to some Americans, and life on the island was ruined. We see an ominous, well-dressed American named Monroe, who treats the general disdainfully. We also learn that Sandra is the general's daughter. After Barney and Christmas kill some soldiers who attack them, Sandra helps them get back to their sea plane, but refuses to leave herself. Back in the U.S., Barney learns that "Mr. Church" is a front for the CIA, whose target is Monroe, a rogue ex-CIA agent involved in drug trade. Barney decides to tell "Mr. Church" that the deal is off. Later, however, Barney's friend and ex-member "Tool" tells him a story about how he (Tool) failed to save a woman from suicide during the Bosnian civil war, which "might have saved what was left of [his] soul." Hearing this, Barney's interests become more than purely mercenary, and he decides to return to the island to save Sandra. His loyal team decides to join him. Gunnar, who has sold out to Monroe, attempts unsuccessfully to

---

[15] The group has no female member, "helicopter pilot" or otherwise, no "in-house scientist," and no former Mossad agent.

kill Barney (before he leaves), and apparently dies in the effort. Meanwhile, Sandra is being tortured on the orders of Monroe, who demands to know what Barney was after. The general is moved by this to confront Monroe and tells him that Monroe can no longer buy him. As Garza asks his people to forgive him for his greed, Monroe kills him. The Expendables, who have returned to the island, rescue Sandra with displays of pyrotechnics and hand-to-hand combat. Monroe and Paine are killed. Before he leaves, Barney gives Sandra the money he was paid for the mission. Back at their headquarters in the U.S., while the men are celebrating, it is revealed that Gunnar is still alive and may rejoin them.

Beyond the basic story of elite mercenaries undertaking a mission to topple a Latin American dictator, the plots are markedly different. When the "more discerning" test is applied, removing unprotectable elements from the comparison, such as *scenes a faire*, Webb's claim is revealed to be objectively unreasonable as a matter of law because of the dissimilar expression which is given to allegedly similar elements. And when the elements of the Film which are derived from Callaham's pre-*Cordoba* screenplay are also removed from that analysis, the claim is revealed to be palpably frivolous.

"The total concept and feel of a literary work is comprised of the way an author 'selected, coordinated and arranged the elements of his or her work,' taking into consideration similarities in 'mood, detail or characterization.'" Brown, 2005 U.S. Dist. LEXIS 15995, at *31-32 (citations omitted). The "total concept and feel" of *Cordoba* and the Film are dissimilar, as are their mood, details and characterizations of these works are substantially dissimilar.

The very essence of *Cordoba* is a complicated plot that concerns a "caper" or "swindle" with a triple-cross and even a "QUADRUPLE-cross" (Ex. A to Answer at 115). Toward that end, St. John assumes various false identities to infiltrate the junta and ingratiate himself with Gen. Garza and Col. Torres, using his deceptions to turn them against each other. He accomplishes this

through "Thornhill's" "discovery" of the fake assassination attempt and a comedic drinking scene in which he and the general are "three sheets to the wind" (Id. at 61-62). Also key to his scheme is the assistance of Renata and her rebels. The story ends with Sir Reginald getting what he wanted – the rescue and return to him of his former Indian lover and their children.

The Film is markedly different in these essential respects. It is a rather uncomplicated, full-on action/adventure story. There is no "caper," "swindle" or "quadruple-cross." The Expendables defeat the regime on Vilena with force, not subterfuge. Barney does not infiltrate the dictator's inner circle. Barney plays no role in turning Monroe and Garza against each other. There is no comedic scene, drunken or otherwise, and there are no armed rebels who work in tandem with the Expendables. Nor is there any sexual liaison between Barney and Sandra. Unlike *Cordoba*, at the Film's conclusion it hardly seems that the man who hired Barney, "Mr. Church," gets what he wants. Moreover, the Film features a betrayal by a team member – Gunnar – after he is ousted from the group, an element which is not in *Cordoba*. See Brown, 2005 U.S. Dist. LEXIS 15995, at *31-32 (comparing action-packed *Daughter of God* with intellectual, complex treasure hunt featured in *Da Vinci Code*); Green, 885 F. Supp. at 482 (tonal difference is reinforced by the two works' different ending); Williams, 860 F. Supp. at 166.[16]

### C.   There is No Actionable Similarity Between The Characters

Copyright law provides only limited protection to characters. Just as basic ideas elude copyright protection, basic character types are not protectable. See Warner, 720 F.2d at 242 ("Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement."); Sheldon Abend Revocable Trust v.

---

[16] Even the settings and pace are different. The Film takes place on a small island, as did Callaham's preexisting screenplay. *Cordoba* takes place on the South American mainland, as indicated by numerous references to the Andes. As for pace, while *Cordoba* has intricate schemes, the Film is almost pure action, and thus is faster paced.

<u>Spielberg</u>, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010)("The bar for substantial similarity in a character is set quite high"); <u>Hogan</u>, 48 F. Supp. 2d at 310; <u>Arden</u>, 908 F.Supp. at 1261; <u>Smith v. Weinstein</u>, 578 F. Supp. 1297, 1303 (S.D.N.Y.), <u>aff'd w/o op.</u>, 738 F.2d 419 (2d Cir. 1984) ("[N]o character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines").

Plaintiff's allegations of similarity between characters in *Cordoba* and the Film ignore the high burden that must be met to establish actionable similarity of characters.  (Plaintiff also ignores the fact that most of the Film's characters are based on characters from Callaham's pre-*Cordoba* drafts.) The particularized details and development of these characters are decidedly different, as opposed to the "broader outlines" upon which Plaintiff relies.

*Anselm St. John and Barney Ross*:  These characters are as different as the mythic Odysseus and Achilles.  St. John, who rejoices in his love of the "quadruple-cross," is more than just a fighter; he is a thinker and swindler *extraordinaire*.  The success of his "caper" depends on it.  Indeed, like Odysseus, he conceives the "Trojan Horse" truck attack in *Cordoba*. (<u>See</u> Ex. D to Answer at 14-16; Ex. A to Answer at 91-94.) He is motivated by his daughter's well-being.  He is portrayed throughout as only taking on causes he thinks are right.  Barney Ross, by contrast, is no scam artist and he does not rely on trickery to take down the regime on Vilena.  He is a warrior, pure and simple – like Achilles.  He has no family or attachments.  At the Film's beginning, he cares only about the money – a mercenary in the purest sense, but Tool's speech about a lost opportunity to save one's soul by saving another person changes him, causing him to return to Vilena to save Sandra.

*Sir Reginald and "Mr. Church"*:  Plaintiff inexplicably alleges substantial similarity between Sir Reginald and "Mr. Church," describing both as "an older, seemingly rich executive [who] meets the hero and tries to hire him."  (Complt. at ¶23 (8).)  Sir Reginald is a 96-year-old Scottish billionaire

(i.e., he is *profoundly*, not "seemingly," rich) who lives in a castle and forces St. John to take on a mission to stop the junta's genocide by threatening to harm St. John's daughter. His objective is the safety of his former lover and their children. "Mr. Church," in contrast, is a middle-aged American who is a front man for the CIA. He is not concerned with genocide or saving his, or anyone else's, family. His pitch is only about money – which he offers to both Barney and "Trench" (Arnold Schwarzenegger); no family is threatened. Unlike Sir Reginald, who is open about who he is and has personal objectives (his family), "Mr. Church" is secretive and he has no personal objectives.

   *Renata and Sandra*:  Renata in *Cordoba*, who is Gen. Garza's niece, is also "Salvadora," the masked leader of the rebel movement, who joins St. John in his grand swindle. She is his co-conspirator in the staged "assassination" attempt on the general, even pretending to take a bullet; she sets up her own "arrest"; and she fakes being tortured. She has a sexual relationship with St. John. She comically tricks her uncle into naming her the new president as he is dying from his wounds – screaming "*You bitch!*" at her. In the Film, Sandra is Gen. Garza's daughter.[17] She has no secret identity, does not lead any rebel movement, uses no weapons, and does not join Barney in any scheme, because the Expendables' approach is purely battle-oriented. She does not fake torture; she is *genuinely* waterboarded on Monroe's orders. There is no sexual relationship between her and Barney. She does not succeed Gen. Garza at the end of the Film.

   *The Dictators*:  In addition to the incontrovertible fact that Callaham's drafts had such a character before Webb did, there is nothing protectable about the character of "an evil military dictator of a small Latin American nation." (Complt. at ¶23(2).)  See, e.g. Hogan, 48 F.Supp. 2d at 310-11. Webb's Gen. Enrique Garza in *Cordoba* is a tyrant with a distinctly comical side. Webb

---

[17] As noted above, she is derived from "Sophie, the daughter of "Dr. Adoti" in Callaham's draft. When Stallone dropped the Dr. Adoti character, he changed the daughter character who aids and motivates the hero, renamed "Sandra," the be the general's daughter, because he like the irony. (56.1 at ¶13(e).)

describes him as having a "*bandito*-style mustache [that] is strictly Pancho Villa" (Ex. A to Answer at 4), suggesting a buffoonish persona. He is comical when he and "Thornhill" drink together and are "three sheets to the wind." (Ex. A to Answer at 61-62.) He engages in joking banter with Col. Torres, in which they call each other "Fascist viper" and "Marxist mongoose," which Webb describes as "an inside joke" and "a ritualized exchange that they both enjoy." (Ex. D to Answer at 3; Ex A to Answer at 5.) His comical aspects are evident to the bitter end, when he repeatedly calls Renata "*You bitch!*" (Ex. A to Answer at 111.) He is, nevertheless, the leader of the regime. In sharp contrast is the Film's Gen. Garza, who is neither humorous nor in control. He has "sold his soul" to Monroe, who treats him with disdain. He finally stands up to Monroe at the end, and is killed for it.[18]

    *Col. Torres and Monroe*:  Comparing Col. Torres in *Cordoba* to Monroe in the Film, Webb alleges that the general/dictator has a "number two" as his security chief, "a man who represents an ideology hostile" to his own. (Complt. at ¶23(3))  Despite Plaintiff's misleading descriptions, these characters are not similar.  Monroe is a renegade ex-CIA agent, who, contrary to being the dictator's "number two," is the man to whom the general has "sold his soul" and by whom he is treated as a puppet.  Neither their working arrangement nor the friction between them concerns "ideology."  (Moreover, the character of a rogue CIA agent who protects the general is seen in Callaham's script, there known as "Ballcap." See 56.1 at ¶13(d).)  In *Cordoba*, Webb actually stresses that there is <u>no</u> genuine hostility of ideologies between Gen. Garza and Col. Torres; their "ritualized exchange" of "Fascist viper"/"Marxist mangoose" is "an inside <u>joke</u>." (<u>See</u> Ex. A to Answer, at 5; Ex. D, at 3.)

---

[18] The Film's general is derived from General Miramonte in Callaham's drafts. Stallone wanted a shorter name and chose the name of a boxer (as he did for Barney Ross). (Stallone Dec. at ¶4.)  The use of the common name "Garza" does not constitute actionable similarity.  <u>See</u> <u>Hogan</u>, 48 F. Supp. 2d at 309-10 (holding that two main characters, both half-human, half-vampires named "Nickolas Gaunt" not actionably similar).

### D.   Additional, Abstract Comparisons Drawn By Plaintiff Reveal The Meritless Nature of His Claim

In addition to ignoring the differences in plot, "overall concept and feel" and characters, Plaintiff's allegations of "substantial similarity" of "protectable aspects" (Complt. at ¶23) includes asserted similarities which actually serve to reveal how utterly misconceived his claim of infringement is. He draws abstract comparisons between story elements that are the epitome of dissimilar expression of abstract ideas. Examples include the following:

(1)   Plaintiff asserts that both works open with a "hostage rescue at sea." (Complt. at ¶ 23(1)). *Cordoba* features the rescue of a <u>Saudi princess</u> from a <u>Korean gangster</u> in a <u>speedboat chase</u>, while the Film features the rescue of numerous <u>male captives</u> from <u>Somalian pirates</u> on a <u>cargo ship</u>. (Moreover, Callaham's pre-*Cordoba* screenplay features a hostage rescue.)

(2)   Plaintiff asserts that "one of the mercenaries visits a young woman he loves. They have a strained, awkward conversation….They love each other but are clearly alienated." (Complt. at ¶ 23(6).) The scenes in question are not even similar in idea, let alone copyrightable expression. In *Cordoba*, St. John, the leader of the mercenaries, is visiting his <u>daughter</u> at college. In the Film, Lee Christmas, not Barney, drops in on his <u>girlfriend</u>, with whom he has an awkward conversation because she has taken up with another man.[19]

(3)   Plaintiff asserts that "[t]he linchpin moment…comes when Garza is giving a political speech…." (Complt. at ¶23(19).) Notwithstanding Plaintiff's effort to make distinctly different scenes sound similar, the general's scheduled, televised speech in *Cordoba*, in which he announces his intentions to nationalize the country's oil industry, is not the "linchpin" of the plot. It merely it presents St. John with the opportunity to enact his complex scheme, during which he turns the

---

[19] As it happens, Callaham's script had the hero, Barrow, visiting his daughter in college <u>before</u> Webb wrote *Cordoba* (<u>see</u> Ex. C to Answer at 65-74), so by Plaintiff's logic, an inference should be drawn that he was copying Callaham. Indeed, Callaham's draft involves complex schemes and plot twists, as does the subsequently-written *Cordoba*.

23

junta's forces against each other.  Nor is the general's speech in the Film the "linchpin moment" of the plot.  By contrast to Webb's dictator acting consistently with his greed by nationalizing the oil industry, in the Film the general is repentant for his greed and seeks his people's forgiveness.  The "linchpin moment" of the Film is actually when Tool's speech about a lost opportunity to save a Bosnian woman -- and his own soul -- moves Barney, who was going to decline the mission, to return to Vilena to save Sandra.

(4)      Plaintiff alleges a similarity in the endings of the two stories. (Complt. at ¶ 23(22)). The referenced scenes bear no similarity.  St. John's dialogue in *Cordoba* -- in which he boastfully rejoices in his love of a "flim-flam…, sting, swindle…," as he departs Cordoba, bears no actionable similarity to what Webb describes as Lee Christmas's "rapping about his prowess with a knife" at the end of the Film, when the men are already back at Tool's tattoo parlor in the U.S.  Nor is there any actionable similarity between the use of "a Porsche and military transport" in *Cordoba* and the Expendables' motorcycles in the Film.

Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 623-27 (2d Cir. 1982), is instructive on how seemingly similar elements may be similar only "at a level of abstraction far beyond that which copyright will protect."  Under Burroughs, the above are perfect examples of what does not constitute substantial similarity of expression, because while, in the abstract terms offered by Plaintiff, they may be made to sound similar, they are manifestly different in protectable  expression. See also Lewinson, 659 F. Supp. 2d at 566 (noting that "[d]espite the abstract similarity of these overlapping scenes," works were dissimilar when examined in detail); Zambito, 613 F. Supp. at 1112 ("that both scripts utilize sunlight to locate the treasure reveals a similarity too general to afford protection."); Smith, 578 F. Supp. at 1303 (common device of prison rodeo as vehicle for escape expressed dissimilarly in works).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court award them

summary judgment dismissing Plaintiffs' Second Amended Complaint in its entirety, and for such

other and further relief as the Court deems just and proper.

Dated: March 15, 2012

PRYOR CASHMAN LLP

By: _____
Tom J. Ferber
James A. Janowitz
Benjamin S. Akley
Attorneys for Defendants
7 Times Square
New York, New York  10036-6569
(212) 421-4100