Tom J. Ferber
James A. Janowitz
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x,

MARCUS WEBB,

               Plaintiff,

- against -

SYLVESTER STALLONE, ET AL,

               Defendants.
-----------------------------------------------------------x

11 CIV 7517 (JSR)

**DECLARATION OF DAVID E. CALLAHAM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

DAVID E. CALLAHAM declares as follows:

1. I am a defendant in the above-captioned action. I submit this declaration in support of the defendants' motion for summary judgment. I am personally familiar with the matters hereinafter set forth, except as may be otherwise indicated.

2. I understand that Plaintiff claims that the motion picture "The Expendables" (the "Film") infringes copyrightable material in his screenplay and short story entitled "The Cordoba Caper" ("*Cordoba*"). I received a "Story By" credit on the Film, and share a "Screenplay By" credit with Sylvester Stallone ("Stallone"), which I understand is the reason why plaintiff has named me as a defendant in this action. As is explained below, the screenplays which I wrote, which were later revised by Stallone for the Film, were written *before* Plaintiff Marcus Webb wrote *Cordoba*.

3. In or about November 2002, I entered into a two-picture agreement with Warner Bros., pursuant to which I would deliver two screenplays to the studio. The first of these screenplays would be for a motion picture based on the video game "Doom." I wrote and delivered such a screenplay to Warner Bros., and "Doom" was released in 2005. The second screenplay I was to write under my 2002 agreement with Warner Bros. was, at the time, designated as a "blind commitment," with the particulars of the screenplay to be agreed upon at a later date.

4. I was intrigued by news reports about private mercenaries hired by the U.S. government, such as those provided by Blackwater in Iraq, and some time in late 2003 or early 2004, I proposed a screenplay about a group of American mercenaries toppling a foreign dictator. Warner Bros. liked the idea and it was agreed that I would proceed with a screenplay based on it, with two producers whom Warner Bros. had attached to the project. After receiving some comments on very early drafts from these producers in early 2005, I prepared and delivered the first "Studio Draft" of my screenplay, tentatively entitled "Barrow," dated June 8, 2005, to Warner Bros. (A copy of that draft is attached hereto as Exhibit "A.")

5. After receiving some comments and doing some re-thinking of my own, I revised my "Studio Draft" twice, once in or about August 2005, and the second time in January 2006. My "3rd Studio Draft," dated January 24, 2006, was sent to Warner Bros. within days of that date. It was the last draft I wrote of my screenplay, which then bore the working title "Barrow," and the last writing I did on anything relating to the Film. (A copy of my "3rd Studio Draft" is annexed to the Answer to the Second Amended Complaint at Exhibit "C.)

6. In the early summer of 2008, I was advised by one of the producers that my screenplay had been forwarded to Stallone through the William Morris Agency. I later learned

2

both that Nu Image was planning on producing a film called "The Expendables" starring Stallone and other action stars, and that the Film was based on a Stallone revision of my screenplay. (One of the earliest revisions of my screenplay is attached hereto as Exhibit "B." The Film ultimately dropped several characters and scenes.)

       7.      Both my "3rd Studio Draft" and the Film contain the following elements (among many others):

       a.      The story opens with a hostage rescue by a close-knit group of highly trained mercenaries who are led by an isolated main character. In my script, the hostage rescue was of American engineers who had been kidnapped in Iraq, while in the Film it is a hostage rescue on a cargo ship which has been taken over by Somalian pirates in the Gulf of Aden.)

       b.      Thereafter, a somewhat suspicious businessman operating under an obvious alias ("Mr. Monday" in my drafts, "Mr. Church" in Stallone's) hires the main character and his group to overthrow a general who has become the oppressive dictator of a small Latin American island nation.

       c.      The main character and his closest "teammate" then make an initial visit to the island for reconnaissance purposes, posing as photographers. They meet a young native woman who shows them around the island, helps them escape after they run into trouble, and inspires the main character to return.

       d.      There is a present or former CIA operative on the island who is keeping an eye on the dictator and answers to a corrupt superior ("Ballcap" and "Murali," respectively, in my draft, and "Paine" and "Monroe," respectively, in the Film).

       e.      The mercenary leader later learns that the man who hired him has his own secret agenda in the country.

    f. The main character decides to return to the country anyway, in hope of toppling the oppressive dictator, and is joined by his loyal teammates.

    g. After much fighting (including hand-to-hand combat between the mercenaries' leader and the "Ballcap"/"Paine" character) and pyrotechnics, the mercenaries succeed in toppling the dictatorship, but in both cases, rather than performing as the mysterious figure who had initially retained them had expected, they attempt to turn control of the country over to its citizens and the main character gives the money he was paid to the young native woman.

Although character names and details were changed, several characters were dropped entirely, and a whole sub-plot regarding CIA agents who were in pursuit of the main character in my scripts was deleted, the Film retained all these, and many other, elements from my "3rd Studio Draft" of January 24, 2006, while adding and focusing more on action sequences.

  8. I have never heard of *Cordoba* or Marcus Webb until this case, and I have never to this day read (or even seen) either Mr. Webb's *Cordoba* screenplay or short story. I have seen Plaintiff's copyright registrations, and noted that Mr. Webb apparently did not write or register *Cordoba* until *after* I had written and submitted three drafts of my screenplay to Warner Bros. Thus, it is beyond dispute that I could not have, and did not, copy *Cordoba* in writing my draft screenplays. Similarly, any elements in the Film which come from my pre-*Cordoba* drafts were obviously not the product of any copyright infringement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March /4/, 2012.

                    David E. Callaham

4