UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MARCUS WEBB,

        Plaintiff,

   -v-

SYLVESTER STALLONE, et al.,

        Defendants.
------------------------------------x

11 Civ. 7517 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

    Plaintiff Marcus Webb accuses defendant Sylvester Stallone of copying Webb's screenplay The Cordoba Caper for Stallone's 2010 action movie The Expendables. On this basis, Webb brought the instant copyright infringement action against Stallone, his co-writer David Callaham,[1] and the various Hollywood entities that produced and distributed The Expendables -- Alta Vista Productions, Double Life Productions, Lions Gate Films, Lions Gate Home Entertainment, Millennium Films, and Nu Image Films. On March 15, 2012, defendants moved for summary judgment on plaintiff's claim. By "bottom line" Order dated June 22, 2012, the Court granted defendants' motion for summary judgment in its entirety. This Memorandum Order sets forth the reasons for that ruling and directs the entry of final judgment.

---

[1] On April 26, 2012, defendant Callaham was dismissed from the case pursuant to a stipulation entered into between the parties and so-ordered by the Court.

The relevant factual background, drawn from the parties' Local Civil Rule 56.1 statements,[2] is as follows:

Defendant David Callaham had a "blind commitment" to write a script for Warner Bros. studios. Defendants' Statement Pursuant to Local Rule 56.1 dated Mar. 15, 2012 ("Def. 56.1") ¶ 1. In late 2003/early 2004, after watching news reports about Blackwater and mercenaries, he suggested to Warner Bros. that he might write a script about a group of American mercenaries taking on a foreign dictator. Id. ¶ 2. Callaham sent Warner Bros. the first draft of this script, tentatively titled Barrow, on June 8, 2005. Id. ¶ 3. Callaham revised this draft two more times. He sent Warner Bros. the third draft on January 24, 2006, which was the last draft of Barrow and the last work Callaham did pertaining to the Expendables. Id. ¶¶ 4-6; see also Answer to Second Amended Complaint ("Answer"), Ex. C (Barrow "3rd Studio Draft").

Plaintiff Marcus Webb is an employee of Walker Digital, LLC, where he write speeches for the company's executives, scripts promotional videos, and works on marketing materials. Id. ¶ 16. He also writes for trade magazines. Id. ¶ 17; Response to Defendants' Statement Pursuant to Local Rule 56.1 and Plaintiff's Statement of Additional Material Facts dated Apr. 6, 2012 ("Pl.

---

[2] Where the Court cites only defendants' Local Civil Rule 56.1 statements, plaintiff has admitted the factual assertion.

2

56.1 Resp.") ¶ 17 (noting plaintiff continues to write for trade magazines). He has never worked in television or movies, and although he has written a number of screenplays, none of them has been produced. Def. 56.1 ¶ 18.

In 2006, Webb wrote a screenplay featuring a team of American mercenaries, who are hired by a billionaire to stop a genocide, and end up rescuing a young woman. Id. ¶ 20. He titled the screenplay, The Cordoba Caper. Id. ¶ 20; see Answer Ex. A (screenplay for The Cordoba Caper). The story had two villains: General Garza, a Latin-American fascist dictator; and Colonel Torres, his Marxist second-in-command, who was the minister of state security. Id. ¶ 22. Webb stated that he wanted to use a "triple-cross" plot structure, where the protagonist poses as someone else (a CIA agent) posing as someone else (an oil executive). Id. ¶ 23 (analogizing to films like The Sting, Where Eagles Dare, and The Thomas Crowne Affair). Webb also wanted to include an ideological struggle between Garza and Torres, based on "Night of the Long Knives," and an underground resistance movement, whose leader, a woman, fell in love the main character, but was secretly related to General Garza. Id. ¶¶ 24-26. Webb wrote a screenplay and short story version of Cordoba in March and April 2006, which he then registered with the U.S. Copyright Office on June 8 and June 9, 2006. Id. ¶¶ 28-30. Webb's script

3

was written entirely after Callaham finished his last draft of Barrow. Id. ¶ 29.

In 2008, defendant Sylvester Stallone told his agents that he was interested in doing an action-oriented ensemble film. Id. ¶ 7. His agents obtained scripts for him to review, and he recalls reviewing Callaham's last draft of Barrow, which he assumes came through his agency (although he does not know for sure). Id. ¶ 8; Pl. 56.1 Resp. ¶ 8. Stallone then began writing his own screenplay. Here, the parties dispute how much of Stallone's story was sourced from Callaham's script for Barrow, and how much was sourced from Webb's script for The Cordoba Caper. As for Barrow, Stallone admits to using it as a "starting point" for his screenplay, which he states he reworked through several drafts to simplify the plot and keep the focus on an action-packed move. Stallone Decl. ¶ 3 (explaining changes made and elements from Barrow retained); see also Declaration of David E. Callaham in Support of Defendants' Motion for Summary Judgment dated Mar. 14, 2012 ("Callaham Decl.") ¶ 6, Ex. B (The Expendables "First Stallone Draft" dated Sept. 18, 2008). Stallone denies ever seeing Webb's script for The Cordoba Caper. Id. ¶ 6.

Stallone's finished screenplay, titled The Expendables, is about a group of mercenaries led by Barney Ross (Stallone's character) who are hired by the CIA to bring down a

4

Latin American dictator named General Garza. The Expendables was turned into a major motion picture starring Stallone, Jason Statham, Jet Li, Dolph Lundgren, Bruce Willis, and Arnold Schwarzenegger and was released on August 13, 2010. Def. 56.1 ¶ 15; Answer Ex. B (DVD of The Expendables).

Against this background, the Court turns to the legal merits of plaintiff's claim of copyright infringement. To establish infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Pubs., Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). "The second element, copying, is comprised of two requirements: actual copying and improper appropriation." Muller v. Twentieth Century Fox Film Corp., 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011) (citing Laureyessens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir. 1992)).

> Copying may be established "either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998). The level of similarity needed to establish copying is now commonly referred to as "probative similarity." See id. Once copying has been established, a plaintiff must next demonstrate that the copying was unlawful by showing that there is a substantial similarity between the protectable elements in the two works.

Hogan v. DC Comics, 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999) (citation omitted). Here, defendants concede Webb has a valid

5

copyright in Cordoba that has been registered. Def. 56.1 ¶ 30 (citing Compl. ¶ 18, Exs. A-B). They dispute the second element, copying of protected elements.

Defendants argue that Webb cannot establish copying of any kind, for three reasons: (1) because Barrow, defendants' admitted source for The Expendables, was written before Cordoba, thus showing creation independent of Webb's work; (2) because Webb cannot show that Stallone had access to Cordoba when Stallone drafted The Expendables; and (3) because there are no similarities between Cordoba and Expendables that are probative of copying. The Court addresses each of these arguments in turn, and determines that because no reasonable juror could conclude that Stallone copied from Cordoba, defendants are entitled to summary judgment.

Defendants argue that because Barrow was written before Cordoba, and because Barrow indisputably served as the starting point for The Expendables, defendants have established that The Expendables was independently created, not copied. See Dimmie v. Carey, 88 F. Supp. 2d 142, 150-51 (S.D.N.Y. 2000) (granting summary judgment on independent creation grounds where there was evidence of evolution of defendant's work separate and apart from plaintiff's work). Particularly because plaintiff submits no evidence of actual copying, defendants argue this is a sufficient basis for summary judgment. See Muller v. Twentieth Century Fox

6

Film Corp., 794 F. Supp. 2d 429, 443-44 (S.D.N.Y. 2011) (granting summary judgment on independent creation where no evidence of actual copying).

As plaintiff points out, however, independent creation is an affirmative defense, and the burden of proof on defendants is stringent: "strong, convincing, and persuasive evidence" of independent creation is required, in order to avoid relying solely on the affidavits of the parties. Repp v. Webber (Repp I), 892 F. Supp. 552, 558 (S.D.N.Y. 1995), aff'd in part, rev'd in part, Repp v. Webber (Repp II), 132 F.3d 882 (2d Cir. 1997), cert. denied, 525 U.S. 815 (1998). The Second Circuit has held that the strength of such a defense is "a question for the factfinder." Repp II, 132 F.3d at 891.

The fact that Stallone now admits Barrow was a source for The Expendables is not by itself sufficient to warrant summary judgment on the ground of independent creation. Indeed, the admission smacks more than a little of hypocrisy. Stallone previously asserted in a signed letter submitted in his Writer's Guild of America arbitration with defendant Callaham, Barrow's author, that although he read Barrow, he "set it aside," and that Expendables was "an original . . . and doesn't use one word, one comma, one iota from [Barrow]." Declaration of David Gold dated Apr. 6, 2012 ("Gold Decl.") at ¶¶ 3-4, Ex. B ("Stallone Letter") at 2. The arbitration panel rejected Stallone's argument, and

7

awarded Callaham "story by" credit and shared "screenplay by" credit. See Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment dated Apr. 18, 2012 ("Def. Reply Br.") at 3. It is only now, when it is in his self interest, that Stallone admits to copying Barrow. In the face of such inconsistency, the question of whether to credit Stallone's declaration that he has never seen Cordoba and wrote The Expendables entirely independent of Cordoba is for the factfinder to decide. See also Transcript of Oral Argument dated Apr. 26, 2012 ("Tr.") at 17-20 (defense counsel arguing that Stallone simply signed an "advocacy" letter prepared by his previous attorney, and never disclaimed starting from Barrow). Moreover, even if Stallone's declaration here is totally truthful, copying from one screenplay (Barrow) does not inoculate Stallone from the claim that he also copied from a second screenplay (Cordoba). Viewing the facts in the light most favorable to Webb, the non-moving party, and drawing all reasonable inferences in his favor, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), the Court cannot conclude that a mere declaration attributing The Expendables to one screenplay and disclaiming attribution to the other is sufficient to carry defendants' burden of "strong, convincing, and persuasive evidence" of independent creation such that a reasonable jury could reach no conclusion other than finding independent creation.

8

Defendants next argue that Webb cannot present any evidence that Stallone ever saw the Cordoba screenplay. To show what is referred to in the case law as "access," plaintiff must show either (1) "a particular chain of events" or a "link" from his work to the creators of the allegedly infringing work, or (2) that plaintiff's work was "widely disseminated." Gal v. Viacom Int'l, Inc., 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007); see also Mowry v. Viacom Int'l Inc., No. 03 Civ. 3090 (AJP), 2005 U.S. Dist. LEXIS 15189, at *12-13 (S.D.N.Y. July 29, 2005). A work is "widely disseminated" when it has had "considerable commercial success" or is "readily available on the market." Silberstein v. Fox Entm't Group, 424 F. Supp. 2d 616, 627 (S.D.N.Y. 2004). Moreover, plaintiff must meet this showing with "significant, affirmative and probative" evidence, not mere "speculation or conjecture." Muller, 794 F. Supp. 2d at 439 (quoting Jorgensen v. EPIC/SONY, 351 F.3d 46, 51 (2d Cir. 2003)). That said, access can be inferred where "a party had a reasonable possibility of viewing the prior work," Boisson v. Banian, Ltd., 273 F.3d 262, 270 (2d Cir. 2001), and less proof of access is required when there is stronger proof of similarity, Jorgensen, 351 F.3d at 56.

Plaintiff's circumstantial affirmative evidence of access is weak, to say the least. Webb, who is not a professional screenwriter, and has no previous screenwriting credits to his name, submitted Cordoba to eight "well-known" screenwriting

9

competitions, which purportedly pride themselves on discovering new material and employ staff and judges with contacts in the movie industry. Declaration of David M. Kohane in Opposition to Defendants' Motion for Summary Judgment dated Apr. 6, 2012 ("Kohane Decl.") Ex. B, Deposition of Marcus Webb dated Feb. 9, 2012 ("Webb Dep.") at 241. Stallone testified that he gets screenplays from his agents, but does not know where his agents obtain those screenplays. Kohane Decl. Ex. A, Deposition of Sylvester Stallone dated Feb. 28, 2012 ("Stallone Dep.") at 188. Before writing The Expendables, Stallone reviewed fifteen screenplays from unknown sources. Id. at 24-25. Trevor Short, CFO of Nu Image, stated in his deposition that writing the Expendables was "chaotic, at the best of times," with "contributions," from "thousands of people." Kohane Decl. Ex. C, Deposition of Trevor Short dated Mar. 8, 2012 ("Short Dep.") at 22, 24-25. Short could not, however, identify these "people," which plaintiff argues exponentially increases the ways Stallone might have accessed Cordoba.

Nevertheless, it would require almost endless speculation to explain how Webb's submission of Cordoba to amateur screenplay competitions ended up in front of Stallone. Indeed, even after full discovery, plaintiff submits no evidence whether anyone who worked for Stallone -- or even anyone who worked at the companies who worked for Stallone -- participated

10

in or had connections to any of these screenwriting competitions. In the absence of this or other evidence presenting a reasonable possibility that Stallone viewed Cordoba, as opposed to mere speculation or conjecture, plaintiff has failed to raise a genuine issue of material fact on access. See Muller, 794 F. Supp. 2d at 439 ("'A reasonable possibility' is not simply a 'bare possibility' . . . .").

Plaintiff seeks to overcome this defect by relying instead on the doctrine of "striking similarity." It is true that "[w]hen two works are so 'strikingly similar' as to preclude any possibility that the second work was independently created, no more evidence [of access] is necessary." Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp., No. 04 Civ. 5002 (JSR), 2005 WL 1020436, at *3 (S.D.N.Y. Apr. 28, 2005); accord Gaste v. Kaiserman, 863 F.2d 1061, 1067-68 & n.3 (2d Cir. 1988). But no such striking similarity is present here.

The general standard for similarity that is probative of copying requires showing "similarities between the two works that would not be expected to arise if the works had been independently created." Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F. Supp. 2d 514, 522 (S.D.N.Y. 2005). Here, however, where plaintiff relies on the "striking similarity" doctrine to avoid proving access, the "threshold required to establish striking similarity is 'stringent,' and it requires

11

more than a showing of substantial similarity." Vargas v. Transeau, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007), aff'd, 352 F. App'x 458 (2d Cir. 2009) (summary order). To show striking similarity, the works "must be so identical as to preclude any reasonable possibility of independent creation." Dimmie, 88 F. Supp. 2d at 150 (emphasis supplied). Mere multiple similarities are insufficient, and the relevance of a similarity is diminished if the similarity consists of "stock elements" within a genre or otherwise non-protectable elements. Gal, 518 F. Supp. 2d at 543.

Having reviewed the scripts for The Expendables, Barrow, and The Cordoba Caper, the Court concludes that no reasonable juror could find that The Expendables is so nearly identical to Cordoba "as to preclude any reasonable possibility of independent creation," Dimmie, 88 F. Supp. 2d at 150, or even that there exists "similarities between the two works that would not be expected to arise if the works had been independently created." Nicholls, 367 F. Supp. 2d at 522.

Plaintiff lists twenty examples of what he calls "striking similarities" between The Expendables and Cordoba. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment dated Apr. 17, 2012 ("Pl. Opp. Br.") at 7-8. The Court finds none of these examples sufficient to permit a reasonable juror to find "striking similarity," whether

12

considered independently or in the aggregate. To give a few examples:

(1) The Antagonists. Plaintiff points to the identical name of the Latin American dictator, General Garza, as a striking similarity. But, as defendants point out, Garza is a common Hispanic surname.[3] Declaration of David McKenna dated Apr. 16, 2012 ("McKenna Rep.") at 7 & n.2 (noting Garza is the 34th most common Hispanic nickname in the United States); see CK Co. v. Burger King Corp., No. 92 Civ. 1488 (CSH), 1994 WL 533253, at *8 (S.D.N.Y. Sept. 30, 1994) ("The fact that characters have identical names and have similar roles in two works does not necessitate a finding of substantial similarity." (emphasis supplied)), aff'd, 122 F.3d 1055 (2d Cir. 1995); Bevan v. Columbia Broad. System, 329 F. Supp. 601, 605-06 (S.D.N.Y. 1971) (holding "Hogan's Heroes" did not infringe on copyright of play "Stalag 17," even though both works featured German World War II prison camp guards named Sergeant Schultz), abrogated on other grounds by Jorgenson, 351 F.3d at 53 n.5. The title "General," moreover, first appeared in Barrow, where the character was titled "General Miramonte." Answer Ex. C at 10. Stallone states that "Miramonte" was too long a name, and in changing various

---

[3] For example, in 2010, the same year The Expendables was released, NBC aired a short-lived television show called "Outlaw," staring Jimmy Smits as a former U.S. Supreme Court justice named "Garza." See Outlaw, IMDb, http://www.imdb.com/title/tt1592226/ (last accessed Oct. 23,

13

names in Callaham's script, he chose famous boxers for his hero (Barney Ross), and his antagonist (Jaime Garza). Declaration of Sylvester Stallone dated Mar. 12, 2012 ("Stallone Decl.") ¶ 4.

Plaintiff also points to the fact that in both movies, Garza and his accomplice (Torres in Cordoba, Monroe in The Expendables) have their own security forces with different colored uniforms. This, as defendants point out, overstates the point by half (at least). In Cordoba, Torres is Garza's right-hand man and ideological counterpart, who rules with Garza as minister of state security. In The Expendables, Monroe is a rogue CIA agent who uses Garza as his puppet, and travels around with his own bodyguard, Paine. Stallone Decl. ¶ 3(d); see also Def. Br. at 11 n.7 (both Barrow and Expendables have mysterious financial backers, "Mr. Monday," and "Mr. Church," where Cordoba's Scottish billionaire, Sir Reginald, makes no attempt to hide his identity).

(2) The Heroine. Plaintiff also sees supposed striking similarities between Renata, the female protagonist in Cordoba, and Sandra, the female protagonist in The Expendables, in that both are related to Garza (niece and daughter, respectively), both help the heroes, and both are tortured by Garza's accomplice. But, as the Court noted at oral argument, the idea of a heroine allied with the protagonist who is related to the

---

2012).

antagonist and captured by the antagonist's minions is hardly new, as, for example, the familiar story of Robin Hood and Maid Marian (variously described as the niece of Prince John or the daughter of Sheriff of Nottingham) well demonstrates. Tr. at 4. Moreover, the characters of Renata and Sandra are substantially different. Renata leads a double life as Garza's prized debutante/student niece by day (the hero, St. John, meets her at Garza's party), and rebel freedom fighter who leads a violent revolution by night under a *nom de guerre*. She actively assists the heroes in their fight, becomes romantically involved with St. John, and eventually becomes president of her country. Sandra, on the other hand, is estranged from Garza, lives in-country, mourns her country's plight, and acts simply as a guide for the heroes until they are discovered by Garza and the rogue CIA agent's men. Indeed, after reviewing the scripts, the Court finds that Sandra appears to have more in common with Sophie, the female guide character from *Barrow* (who was originally a minor character) than with Renata. See Stallone Decl. ¶ 3(e).

(3) *Action scenes*. Plaintiff also cites a litany of action scenes which he describes as "strikingly similar" to *Cordoba*. These include the use of the heroine as a human shield in the accomplice's escape; strategic planting of explosives by mercenaries in key strategic positions before the coup begins; an attempted ambush by regime forces against the mercenaries; a

15

climactic gun battle with sequenced explosions including detonation of a fuel repository to create a "reverse ambush"; the attempted use, and destruction of, the accomplice's escape helicopter; and a one-on-one standoff where the hero kills the accomplice in a surprise shooting tactic after the accomplice puts a gun to the heroine's head. Pl. Opp. Br. at 8. None of these comes anywhere near striking similarity, let alone even close to substantial similarities that are merely probative of copying. To the contrary, these are all simple stock devices that are standard in action movies. They are "scenes a faire" that follow naturally from the theme of the work rather than from the author's creativity. MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 194 (2d Cir. 2004); see Walker v. Time Life Films, Inc., 784 F.2d 44 (2d Cir. 1985) (holding "drunks, prostitutes, vermin, and derelict cars" are scenes a faire in a work about NYPD cops in the South Bronx); see also Zach Baron, Summermetrics: The Death of the Great American Shoot-'em-Up, Grantland, Aug. 16, 2012, http://www.grantland.com/story/_/id/8272930/summermetrics-expendables-2-death-great-american-shoot-em-up (last accessed Oct. 23, 2012) (evaluating production notes for The Expendables 2 as the Expendables' series attempts to revive and pay homage to the genre of 80s-era action films).

While the foregoing includes, inter alia, all the "striking similarities" that plaintiff's counsel identified at oral argument as being the most "egregious," Tr. at 2-6, the Court has carefully examined the entire litany of plaintiff's proffered "striking similarities" and finds none of them remotely striking or legally sufficient. Any reasonable factfinder would have to conclude that these are two very different screenplays built on a familiar theme: mercenaries taking on a Latin American dictator. But where the more specific development of The Expendables can be clearly traced to defendant Callaham's script, Barrow, there is no such link apparent to Cordoba. See also Berkic v. Crichton, 761 F.2d 1289, 1293-94 (9th Cir. 1985). Indeed, whereas Cordoba uses deception and subterfuge as its central plot devices, The Expendables is a pure action movie, with CIA involvement (heavily distilled from Barrow). Stallone's hero (Ross) engages in no trickery -- just shooting.

Whether considered at the high-concept levels of plot, theme, pacing, etc., or at the detailed level of specific points, plaintiff has failed to show Cordoba is so "strikingly similar" to The Expendables "as to preclude any reasonable possibility of independent creation." Dimmie, 88 F. Supp. 2d at 150.[4]

---

[4] In support of their arguments, the parties submitted reports from their respective expert witnesses, Michael Elias and David McKenna, who offer their opinions on the similarity (or lack thereof) between Cordoba and The Expendables. The Court doubts that these expert reports are admissible under Fed. R. Evid. 702;

17

Because plaintiff has failed to provide evidence of access, and failed to show the Cordoba and Expendables are so strikingly similar as to permit a reasonable juror to infer access, the Court finds the plaintiff's claim fails as a matter of law.[5] Accordingly, the Court reaffirms its "bottom line" Order dated June 22, 2012 granting summary judgment in favor of defendants. The Clerk of the Court is hereby directed to enter judgment in favor of defendants dismissing the complaint with prejudice, and to close the case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         December 26, 2012

---

indeed, they involve no true expertise whatsoever. But neither party moved to strike. Assuming, arguendo, that the reports were admissible, they would not change the Court's conclusion. They simply assert conclusions on similarity based on reading the screenplays, which the Court was more than able to do without the benefit of the reports.

[5] Although the Court therefore does not reach the issue of whether defendants infringed elements of plaintiff's work that are legally protectable, the evidence put forth by plaintiff likewise appears insufficient to show any infringement by The Expendables of protected elements in Cordoba.

18